Good morning. May it please the court. My name is Mike Seneff, and I represent the appellant, M. Defendant Christian Bertoli, along with my colleague, Bonnie Freeman, who is here with me this morning. The entirety of the circumstances that we are dealing with in this case, this trial, and this appeal occurred in less time than it takes to walk from the doors to this courtroom to the podium. They occurred in 4.5 seconds, according to plaintiff's expert. Totally lapsed time. The first 1.8 seconds of that occurred when the only one moving was Christian Bertoli as he moved towards Mr. Oberfelder in his vehicle, in his sheriff's uniform, clearly labeled with a hat, with a badge. He moved to a point, according to the plaintiff's expert, to where he was in front of the vehicle, on the driver's side, according to the plaintiff's expert, even with the center line in the driveway that you see in Exhibit 248 that is in the respondent's brief. Give me a little background here. Why does this deputy come out pointing a gun to begin with, as far as the record is concerned? Normally, deputies keep their guns in their holsters until there is a reason to. It's sort of unusual to have them approach somebody with a gun on sheath like that. As far as the record reflects, the deputy at this point knew that he was about to effect the arrest of a fugitive drug dealer. He knew that this gentleman was involved at the moment in a transaction for the sale of a substantial amount of heroin. He knew that, excuse me, of cocaine. He knew that he had a person who had been on the run for eight years. He knew, as all law enforcement officers know, that as he approached that individual, he should be assumed to be armed and dangerous. He was making a felony arrest under very difficult circumstances. You know, usually police call for backup when they're dealing with a suspect they know ahead of time to be armed and dangerous. It seems like an awfully cowboy thing for your client to have done is to get out of the car, gun drawn, to confront a suspect that if you truly believe that this guy is dangerous. And isn't this the kind of situation that puts an officer in a position to make the kind of tragic mistake that your client did here? He takes on, if we believe his story, and I'm not sure we need to believe his story. After all, we do have a jury verdict, and maybe it's a different story that we need to believe. But assuming we believe your client's story, he puts himself in a situation where he has to confront what he claims to be a dangerous suspect with obviously inadequate protection, and puts himself in a situation where he winds up shooting somebody in the back. In the back! And here we have a jury verdict that says that was excessive force. I have a hard time finding that the jury was wrong on that. Why wasn't the safe, prudent, appropriate thing for him to do, if you truly believe this guy is armed and dangerous, is to stand back and call for backups and be in a situation where he has overwhelming power, where he has overwhelming firepower, and there is not the need to pull a gun and maybe pull the trigger thoughtlessly. And maybe kill somebody else. Kill children on the street. All sorts of things can happen once you draw guns. If your honor, please, the officer was in a critical circumstance where he had a dangerous individual that he had to... He needed backup. He need not have gotten out of the car with his gun drawn. He could have laid back. He could have said, I'm not going to do this thing by myself because I'm not a cowboy. I am a professional. Why isn't the very judgment to confront what you claim is this dangerous criminal and to do so with gun drawn on his own, itself, such a misjudgment as to support the jury's verdict? Forgetting what else happened. The jury wasn't assessing, at the time that it found Excessi Force, whether or not Deputy Bertoli was acting reasonable as he approached that... With no backups. And the reason all this whole thing happened, the reason he had to pull the trigger, whatever happened, the whole unfortunate chain of circumstances is the result of the fact that he took inadequate precautions. And he went ahead and unsheathed the gun in a residential neighborhood when what a sound police officer should have done is gotten backups and done this as a team. The jury may have found that, Your Honor, and it may have found that under the context of the evidence that was allowed. And that's one of the evidentiary errors we raise here. Because plaintiff's experts, Mr. Clark, said Mr. Oberfelder, Deputy Oberfelder, was unreasonable in getting himself out there in the kill zone. But if the court please, that's not what he was charged with in this case. He was charged with having used Excessi Force. I thought Oberfelder was the defendant. Pardon? I thought Oberfelder was the bad guy. Mr. Oberfelder is the plaintiff in the civil rights lawsuit. I thought Bertoli was the officer. Yes, that's correct. I must have misunderstood. Excuse me, maybe I misspoke. If I did, I apologize. But the claim here that was put into evidence, and I say improperly so, was that Deputy Bertoli was unreasonable in getting himself out there in the kill zone. The area where any officer would know that he's at risk because he's exposed. But that's not, that is not what the lawsuit is about. Negligence does not rise to a constitutional violation. That wouldn't have to be negligence, but let's get, because it could be that it was just Excessi Force to get out there with the gun to begin with, when there was no reason to do that, because a prudent officer wouldn't have done that. But leaving that aside, the case was tried essentially from the moment that he made that decision, as I understand it, with regard to a Tennessee v. Garner theory that this Deathly Force was excessive, even if you start at the moment that he was out there with his gun. Yes. So what's wrong with the jury verdict, so finding? Well, your main argument, I understand, is a saucier argument, and I have, I really don't understand it, but that may be because I don't understand. My main argument is the qualified immunity. There's no question about that. So the jury was never given the opportunity to consider the case in the context of a qualified immunity. But they were given a instruction that clearly incorporated a saucier standard. So I'm not sure whether you are right that they were entitled to consider the qualified immunity, which is a legal issue, but clearly factually they were told what to find, and they were told they could not find the agent liable if they thought that allowing for mistakes and the need to act under pressure, that the conduct was reasonable, his conduct was reasonable, allowing for all the things the CS says we need to allow for. So what's the beef here? They were not given the, they were not told that a person in Mr. Deputy Bertolli's position or any law enforcement is entitled to a qualified immunity unless he's plainly incompetent or knowingly violates the law. That issue was never. You're objecting to the language of the instruction? The instruction was not given. Well, the instruction was given. There was a long instruction given at pages 1332 through 34 of the transcript, and it doesn't use the phrase qualified immunity, but doesn't it otherwise incorporate all the elements that would allow a jury to find that the officer was entitled to a verdict, whether you call it through qualified immunity or not, if those elements are met? The instruction that was given was given in the context of Tennessee and Garner. What's the context matter? The instruction was the determination of the reasonableness of Deputy Bertolli's belief must be judged from the perspective of a reasonable officer on the scene at the time he fired his weapon, rather than from the perspective of viewing the event after it's already occurred. Your determination must embody allowance for the fact that police officers are often forced to make specific judgments about the amount of force that is necessary, et cetera. So when you come down to it, your brief seems to say substantively that what they weren't asked to do was to make the judgment of whether he could have been mistaken about whether or not he was in danger of his life, and that they were told. So what substantively were they not told? They were not told that if he was reasonably mistaken under the facts, if he was reasonably mistaken under the facts about his right to use deadly force, which is the saucier, second prong of the saucier standard, that he's entitled to a qualified immunity. We would not have put in evidence from that context. They were not told that he's entitled to be immune from liability unless he's incompetent or knowingly violated the law. And that's just one way of phrasing, you know, a fairly rhetorical way of phrasing the standard. I mean, the standard is more specifically whether or not the officer was reasonable in his understanding of the legal parameters. Now, for one thing, when you're dealing with Tennessee v. Garner, what argument is there that he could have been reasonable about the legal standard once he knew the factual circumstances? He knew what the law was. There's never been an issue that Deputy Bertoli... And no reasonable person would have thought the law was other than it is with regard to his right to use deadly force other than when there's a danger of injury or substantial injury. That's the law. He knew the law. That's the way he'd been trained. That's correct. So what's the dispute about? The dispute is that he could be reasonably mistaken about the facts at the moment... Those are the facts, not the law, right? Well, no, because Saussure and the subsequent Ninth Circuit authority that we've cited to the court recently contains the language that you can be mistaken as to the facts that give rise to whether or not your conduct is legal. And in all due respect, the jury wasn't told that. We did not argue or we were not in a position to argue that at the moment he made the decision to shoot the gun, not the moment that the shot was actually discharged, that he was reasonably or an officer in his position would have been reasonably mistaken about the facts. Well, how is that substantively different, though, than what Judge Berzon read to you? There's a sentence saying that the determination of reasonableness is from the perspective of the police officer, and there's a sentence that says that you must allow for the fact that police officers are having to make split-second judgments about how much force is necessary in tense and uncertain circumstances. And I know that's worded differently, but I still don't understand why that doesn't embody the idea that a police officer might, in that split second, make a mistake about the facts and still be entitled to the jury's verdict. I don't see why that doesn't adequately cover that issue. Your Honor, if that embodies the concept and that's the language that was under the instructions before Saussure was decided, then, in fact, the necessary conclusion of that is, therefore, that Saussure didn't make any difference because we're still in a mirror question, flip side of the coin. The fact that this trial judge may have been clever enough to figure out a way to say this that would satisfy it, maybe she just figured it out ahead of time what it should say, but I still don't see why that isn't giving the officer the benefit of reasonable mistake of fact in a substantive sense. Did you offer a different instruction that better embodied this concept? Yes, we did. We offered an instruction which was refused. And that instruction said, in part, that a law enforcement officer is entitled to the defense of qualified immunity for claims for money damages. The defense of qualified immunity is intended to protect a law enforcement officer from liability unless they are plainly incompetent or knowingly violate the law. A law enforcement officer is protected by qualified immunity if a reasonable officer could have believed his conduct was justified. In this case, you must decide whether a reasonable officer would have believed that their life was in danger at the time of the incident. And isn't that exactly what the other instruction said? I mean, when you come down to it, what the substance of the other instruction was? The other instruction, Your Honor, does not tell the jury that the defense of qualified immunity is available to all of those officers who are not knowingly violative of the law or incompetent. But the last sentence, which is the substantive sentence, is embodied in the other instruction. Is that right? Yes. The last sentence I read is correct. That's right. That is embodying, indeed. Most of it is essentially rhetoric around what the substance of the question is. Well, Your Honor, at the time, if you'll recall, at the time we had – I don't believe that's correct, Your Honor. I think that jury, particularly this jury who had asked the trial court, what's the significance of self-defense in the intentional element of the instruction? And the trial court said the only element of intent that you have to look at is whether he intended to pull the trigger, not whether it was an accident or mistake. So this jury, if we can look in jurors' minds, was thinking about the concept of self-defense, which is very similar to the concept of qualified immunity. And there is nowhere in these instructions that the jury was allowed to follow that path. And – You lost me altogether. What plan were they not allowed to follow? This jury – If you've got a problem, you've got an officer that shoots somebody in the back, and you want to sort of make out a case for self-defense, most jurors are going to be skeptical of that. I don't see what instruction – what is it that – I have an officer – What is wrong with this instruction? I have an officer, Your Honor, who is standing in front of a car telling the man to stop, fully signaled, got signs and everything else. The car accelerates at him. Well, he doesn't have a uniform. He has a cap and a shirt. He has a shirt. That's correct. He has a cap and a shirt. How big was the logo on the shirt? It's about this big. It's a dark shirt with a golden yellow logo. Now, there was testimony that the plaintiff did not see the sheriff. Yes, the plaintiff said that. And the jury can believe that? I don't know what the jury believed about that. We take the verdict – we take the evidence, whether there's a dispute in the evidence, as being consistent with the jury's verdict. So as we look at this record, we have to believe, we have to read the evidence, such that they believed the plaintiff. The plaintiff says he didn't see it. Yes. So there he is standing, your officer is standing there, facing a car, wielding a gun, and the plaintiff doesn't see that there's a sheriff. Keep going. The officer – Where does the shooting in the back come in? Your Honor, the – He has to sort of whip around as the car is moving away and pull the trigger, right? No, that's not correct, and the record doesn't show that. If he had shot in the direction of the driveway, he would have missed the car altogether. The only way the officer – I mean, he's standing here, he's facing the car, the car comes towards him, turns, misses him, and is heading down the street in the opposite direction. If the officer is standing there still pointing the gun in the direction where the car used to be, he would have shot in the house. He had to whip around to be able to hit the guy in the back, right? He had to turn his gun and then pull the trigger. He had to do that. Now, where does that come in? I mean, this is your problem with the self-defense section. Since when does shooting somebody in the back amount to self-defense? Why can't the jury say, gee, we don't believe any of that stuff? We believe that the guy pulled the trigger when he knew darn well that there was no danger left. The entirety of this – for the first 1.2 seconds of when that car started to move, it was coming right at the deputy, accelerating, to the point where it hit the front of – And if he had shot then and hit him in the chest, then he'd have a very good case. But the fact is, he didn't. But your – The car comes towards him, misses him, turns, and he has to whip around. He has to – I mean, there's no doubt about it. If he is still pointing the gun the same place – let's say he started pulling the trigger, he would have missed the car altogether because the car is now heading down the road that way, and he would have shot in the house. He had to turn his body. He had to turn the gun to follow the car in order to shoot the guy in the back. Right? I mean, is there any dispute on this? Yes, Your Honor. Your Honor is missing this step. Your Honor is assuming that the perception and the decision to shoot and pull that trigger occurred at the instant that the shot was fired. There's no question – I know the evidence, but this is why we have juries. Yes. We instruct juries as to the law, and then the lawyers get to make their argument. They know it's – I don't know how plausible the argument is that, you know, he started to pull the trigger and then sort of automatically turned around. Maybe the jury will believe it. Maybe not. This jury didn't believe it. This jury found that he used excessive force under the circumstances. What they found was that a reasonable officer on the scene at the time he fired his weapon would not have done this. At the time – at the time that the shot was fired, if you focus on the instant that the shot is actually discharged and fired, anybody who can freeze frame that time period would agree that the car was starting to move away from Mr. – from Deputy Bertoli. So that's your problem? But at the time – at the time the threat was presented, the threat to Mr. Bertoli's life and safety, and the decision is made in his mind, I've got to stop this car and shoot at the same moment that he is twisting and trying to get out of the way. All right. So now we have a very fine-cut problem. The problem, as you're describing it, is whether the focus should have been on the time he made the decision or the time he fired the shot. Now, how does your – how does Saussure address that? How does your instruction address that? How does anything about the issues you've raised in the case address that distinction? My proposed instruction comes before Saussure, but Saussure is the case that speaks as to a reasonable mistake of fact. The fact is that Deputy Bertoli didn't have the benefit of knowing what was going to happen in that millisecond as he made the decision to shoot and the gun was actually destroyed. In terms of your theory that Saussure deals with reasonable mistake of fact, it seems to me it deals with reasonable mistake of law. And, indeed, the law in this circuit is the reasonable mistake of law question is not for the jury anyway. Reasonable mistake of law, according to the language in Saussure, can come from a mistake regarding the underlying facts. And this court has subsequent authority, which we've cited to the court, to that effect. So the language of Saussure is broader than just saying reasonable mistake of law. That mistake of law can come because of a misunderstanding or a mistake as to the underlying facts. You know, I've been reading this instruction and looking it over, and to me it sounds perfect. I don't see a thing wrong with it. It says the deputy had to have a reasonable office in the same position, would have had to have probable cause to believe that Mr. Oberfelder posed a significant threat of death or serious physical injury to himself or others. That's clearly a correct statement of the law. It says the information of reasonableness of Deputy Bertori must be judged from the perspective of a reasonable officer on the scene at the time he fired his weapon, rather than the perspective of viewing the event after it has already occurred. And then it says you must allow for the fact that police officers are often forced to make split-second judgments about the amount of force that is necessary in a particular situation. In circumstances that are tense, uncertain, and rapidly evolving. I can't imagine what's wrong with this instruction. I mean, you sort of want something that's weighted more, you know, uses the words immunity or incompetent and all that, but I don't see what's wrong with this instruction. Where is the error in this? In that instruction in itself, I don't believe there is error if you just take that instruction in and of itself. So what that instruction does not tell the jury, what that instruction does not tell the jury is the elements of the qualified immunity, and it doesn't tell the jury that if the officer was reasonably mistaken under the facts, he's entitled to a protection, which would affect whether the law was clear to him at that instant, that millisecond that he's entitled to the protection of a qualified immunity unless he's plainly incompetent or knowingly violates. Kagan. Saussure says that the concern in Saussure is that an officer might correctly perceive all the relevant facts, but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances, right? That's the basic holding of Saussure. That's correct. And that makes sense in a traditional excessive force case in which the degree of force that's available is in question. But in a Casey v. Garner case, we have a situation in which there's a very clear rule of law once the facts are determined. And, therefore, there's really no room for a second dispute over what force is reasonable if the facts are not misperceived. And that's what this instruction is directed at. In other words, in a Tennessee v. Garner case, we don't have the usual situation in which who knows whether they should have, whether, you know, putting on handcuffs or using a certain kind of hold or whatever. We have a rule that the Supreme Court has enunciated. In this case, we have the situation where we have an expert who says he should have never come up there in the first place. He was unreasonable for getting himself out there in the first place. That's tainted the whole jury deliberation here. I'm sorry. Why is that? Because, Your Honor, as well argued by the plaintiff. In fact, to me, that was about right. The whole thing started because your client decided, I think so, made a decision that was really unwise. But my client, Your Honor, my client was not sued for a bad decision or negligence. He was sued for excessive force. And excessive force. That's what I said. Just coming out there waving a gun, it itself, you know, just poses such serious risk of harm to the suspect, to bystanders that the jury might itself view that very decision to come out of there with a gun drawn, that itself might be insufficient to show excessive force, even if he never pulls the trigger. Just pointing a gun is itself, when it's unnecessary, itself can be excessive force. There was no testimony in this case, and I doubt that you would find any testimony, that when an officer approaches a known narcotics dealer who's a fugitive from justice, that it is inappropriate to have your weapon in the downed ready position. He is approaching that individual with an understanding from his training that that person is presumably armed and dangerous. Do you want to briefly address the you raised several other issues aside from the dossier, and the one that interests me is the one about the medical expenses. What do we do? Suppose we agreed with you about the medical expenses. What do we do? Do we subtract the $30,000, or do we have a new trial? Well, Your Honor, we believe we have a new trial because of all of the issues in the case. I know. I'm not asking you that. As to the medical expense issue itself, I would think that we would subtract the amount. If we did that, if we were, for the sake of argument, if we were to agree with your assertion on the $30,000 of medical expenses, would that in any way affect the attorney fees as a separate issue related to attorney fees or not? I don't think so. It depends on what the balance of the judgment was. You're way over your time. Yes. I apologize. We'll hear from opposing counsel. Let me please the Court. Ezra Hendon for Mr. Oberfelder. You know, in listening to this argument this morning and in reading the briefs, I've sort of come to the conclusion that the nub of the argument that you're being presented with here on the liability issue is it happened fast, therefore we win. And that's really all they have to say, is that it happened within four seconds, and therefore they win. I don't think that's the law. I don't think an officer has the right to do anything that comes into his head just because it happens within four seconds. You're being asked here to reverse a jury verdict in which the jury had overwhelming evidence, almost uncontradicted evidence, that would have allowed it to come to either of two conclusions. One is that the officer was never in front of the vehicle when he made the decision to shoot, or that even if he was in front of the vehicle when he made the decision to shoot, given the fact that he moved six to seven feet to the side, that he gained and lost a line of sight, that he observed the vehicle rolling slowly out and that he tracked it as it went out, that he aimed at the pillar post, made the decision and the judgment to shoot, and shot him in the back. All of these factors could have supported this jury verdict. There really is no basis to overturn it. What is the legal issue here? The legal issue here is qualified immunity, either pre-trial, during the instruction, or post-trial. Pre-trial, I think they're out of court. It was an appealable order. They didn't appeal it, and therefore I don't think you have jurisdiction to review any pre-trial ruling on qualified immunity. And even if you did, I think if you look at the ruling on the motion for summary judgment, Judge Patel was amazingly prescient because I think she actually embodied in her ruling all of the associated factors. She found that there was a reasonable basis for going to the jury on the factual question and that the law was clear. Does the society in general in fact require anything more to go to the jury? I'm sorry? Given our ruling in this circuit that the reasonableness of a legal perception is not for the jury, does society in fact change in any way what is supposed to go to the jury, as opposed to what's supposed to be decided someplace along the way? No. No. The answer to your question is no, it didn't. What society did is it added the second step. The second step was even if the facts were subject to debate, if a reasonable officer could have believed that the law was sufficiently unclear to guide his conduct, then he's entitled to immunity. There's no dispute in this case about whether the law was clear. Officer Bertolli from the stand. Isn't this really, I mean, this seems almost heresy after Saucier, but isn't this really this particular Tennessee v. Garner situation a situation in which there really isn't a second step as a practical matter? Yes. I don't know how far out on a limb I need to get in this case. And I'm not going to go any further out than I need to go. A second step if there was a dispute about whether something was serious bodily injury, for example. I suppose you could have a dispute about whether the, well, if the force was excessive, that's the first step. If there's a dispute about whether the force was excessive, that's the first step. But no, I mean, the law is clear that you cannot shoot a fleeing felon if he doesn't pose a danger. There could be factual disputes about whether he's a danger. And there might even be a legal dispute about what's a danger. But in this case, there isn't one. No. And the officer admitted that he knew that if Oberfelder was not a danger, he did not have the right to use. Counsel, I want to move to the issue of evidence of the medical expenses as well. Yes. Why shouldn't that evidence have been allowed? Why isn't the payment of the medical costs essentially by the defendant's employer something apart from the collateral source rule that should have been subtracted from the verdict? Right. I think if you look at the record and you look at what Judge Patel was saying and you look at what she did, and you look particularly at Government Code Section 985, which is what she cited, and really what she's saying is in a situation like this where a representation is made to her that the monies were paid by, quote, a consortium, a consortium whose exact identity and shape and composition we do not know, that you find the evidence. But they weren't allowed to put on the evidence. Excuse me? They weren't allowed to put on the evidence. Maybe that's why we don't know it. Well, what I'm getting to is that if you look, there is a procedure in the California Government Code, which governs situations exactly like this. You let the evidence come in. 985B says any collateral source payment paid or owed to or on behalf of a plaintiff shall be inadmissible in any action for It, you know, the evidence of the payment, the expenditure comes in, and there's a procedure post-trial for them to present evidence that these monies were, in fact, paid by a government entity. So are you saying they simply didn't follow the right procedure to have the $30,000 subtracted from the verdict? They did not bring their post-trial motion, which would have allowed ‑‑ which Judge Patel invited them to do, and which would have allowed her to determine how much of this money truly was paid by a county. This is a consortium of some sort. Frankly, I don't even know what ‑‑ Well, I thought that on the witness list there was ‑‑ it listed a county representative and that the testimony was described as testimony that the costs of medical care were paid by the county of Sonoma. But that's not ‑‑ yes, but that's not what was represented to her at the pre-trial hearing, and that is, in fact, not the case. It was paid by a consortium. I, as I started to say, don't myself know exactly what the composition of this consortium is, and if you read the record, you'll see that Judge Patel was concerned about the fact that some of these monies may have come from federal sources, which are clearly not under the government code section, which are clearly not covered by the collateral source rule. So what I'm saying is they did not produce evidence which would have allowed her to keep it out. They did not follow the procedure that they should have followed to come back post-trial and make their showing. Where in the excerpts is Judge Patel's discussion of this? I'm sorry. Where in the excerpts is Judge Patel's discussion of this that you're referring to? It's at ‑‑ I will give you the site in a minute. It's in a trial ‑‑ the report is transcript of March 28th, 2001 at pages 10 through 17. So essentially you're representing, which is not in your brief. Yes, I know that. I know that. That the reason why this didn't come in was because they ought to have done it under 985 post-trial, and that was the basis for Judge Patel's ruling. Yes. I think if you read the record, I think you'll find that I'm right on that. That's what you ‑‑ this is one of these cases where things can only get worse if you keep talking. So I'm here to answer any questions you have. I don't think there's a ‑‑ there is a point I do want to make. This business about the only difference between the two instructions, the only really significant difference of any kind between the instruction that they offered and the instruction that we offered is this language that only a plainly incompetent, that qualified immunity protects only a plainly incompetent officer or one who knowingly violates the law. I know of no case in this circuit, certainly, which approves such an instruction. I don't think that's really part of the qualified immunity analysis. I think really if you read the cases and if you read Saussure, which quotes that language, and you see where it is that Saussure quotes that language, all that it's saying is that an officer who has no ‑‑ this is the rationale for the qualified immunity rule. That's really what it is. An officer who has no objectively reasonable basis to believe that he is in danger or anybody else is in danger and who nonetheless uses deadly force is plainly incompetent. I mean, it would be error to find that an officer knows that he cannot use deadly force, uses deadly force, has no objectively reasonable basis to use deadly force, and to then conclude that he's not plainly incompetent I think would be error. So I think all that that language is doing is setting up the rationale for the rule. If you are ‑‑ if you shoot somebody in the back and they are not a danger to you and they're simply fleeing, you're incompetent. And that's what this jury found. There's absolutely no basis to overturn this verdict. This is, as we said in our brief, this is why you have juries. Do you want to briefly address the fees and particularly the multiplier issue? Do I what? The attorney's fees. Yeah. And the multiplier issue, the fact that she ordered a multiplier. You're asking me to comment on that? Yes, I am. Okay. I think the multiplier was too low, right? All right. I'll stipulate to that if you want. What you have in this case is the chief judge of the district who is in charge of the pro bono program, who knows what it takes to get lawyers to take these cases, who knows what she went through to get a lawyer to take this case, who comes to our office and asks us to take the case, we agree to take it. She makes a finding that this was a particularly undesirable case. Your standard of review here is abuse of discretion. You have to ask yourself whether the undesirability of the case is necessarily a part of the lodestar. I contend with all due deference to your dissenting opinion. In the Guam case, that it is not necessarily a part of the lodestar. And then if that's true, then you just ask yourself whether it was an abuse of discretion to make the finding in this case. And I frankly don't see how you can. If anybody knows what it takes to get a lawyer to take cases like this, it's the chief judge of the district who's sat on the bench for 20 years, who's seen a bazillion of these cases. She may know, but we don't? There's absolutely nothing in the record? She says it was more likely than not that Mr. Oberfelder would not have found a lawyer had we not taken the case. What is there to contradict that? In the Guam case, there was at least a declaration to that effect. There was a declaration to that effect. There was nothing here, right? I'm not aware that there was a declaration. There was. I mean, Judge Kosinski didn't care for it, but there was one. That there was no other lawyer who would take the case. Because there are no good lawyers in Guam. That's right. That's right. I know. And for other reasons. But there was something. There's nothing here. Well, I mean, that's not true. You have Oberfelder's letter saying that he had difficulty finding an attorney. As I say, you have the chief judge of the district who administers this program, who has the personal experience, who finds on the basis of her experience that it would be. I think your strongest point is that you didn't find this client. The court found you. Yes. Unlike Guam where they came flocking. Right. People fell all over themselves to handle the case. There weren't people falling all over themselves to grab this client. You know, this is an undesirable case. There wasn't a sort of beauty contest where you had to come in. Which actually speaks to the question of whether the undesirability of the case is a part of the lodestar, is already figured into the lodestar amount. The theory, as I understand it, of saying that the undesirability of the case is a part of the lodestar, is that some sort of market forces are at work and there's some bargaining that goes on. The less desirable the case, the higher the fee that the lawyer is going to charge for it. And once you award the lodestar, you've already taken care of that. Well, it's more than that. Isn't that one of the factors that's listed in Hensley specifically as one of the issues to think about initially in setting the fee? Are you saying that it just doesn't even play into the hourly rate at all? It doesn't apply. I can tell you for what it's worth, in some 30-odd years of practicing law and having seen a lot of fees set, I've never seen a fee set higher because the case was undesirable. Hard or undesirable gets the same amount per hour as easy and delightful. Well, easy and delightful is a different story. Undesirable, those are not the same thing. I don't think easy and delightful and undesirable. We're talking about the inducement to take the case in the first place. Okay. I mean, the reasons why this case is undesirable is that the, you know, many reasons. The damages are low. If you take $30,000 off the damages are going to be even lower. That means what you're saying is that you can't get a contingency fee. You're not going to attract a lawyer. What does that have to do with it if you're being paid on a lodestar basis? Well, you're not going to get a lawyer to take a case on this basis, that's all. You're talking about whether the case would be, whether you'd get somebody to take a case. What you're saying is that you couldn't market it to a contingency lawyer because he couldn't get a contingency. And whatever market forces are at work, they're certainly not. There are no such forces at work in a case where you're appointed by the court. I mean, we're not in a position to bargain with Judge Patel about what she's going to give, what rate she's going to reward us, what she thinks is reasonable. So if there's anything special about this case, as Judge Kuczynski says, and this is what's troubling me is simply, you know, that dag is there, whatever we may think of it, and that, therefore, one has to find some unusual circumstance. And the only unusual circumstance, it seems to me, is the one that Judge Kuczynski has pointed to, that is that somebody came to you. Well, somebody came to us and asked us to take a case that ‑‑ Somebody. And a judge. Yes. A judge came to us and asked us to take a case, right, somebody who we ‑‑ Sister, though. That's right. That's right. came to us and asked us to take a case that few other lawyers would have taken. You know? I think the less said, the better. Okay. Okay. Thank you. We will allow a minute for rebuttal for the other side. Your Honor, I have two comments, three comments. On the qualified immunity issue, Saussure did affect a change in the law in qualified immunity analysis. The trial court had the opportunity to address that at the time of the hearing on motion for a new trial and declined to do so. And at that point said even if qualified immunity were before this jury, she would find as a matter of law that there was no showing of qualified immunity and it's your burden. Well, it may be our burden, but we didn't have that defense there. And she may want to at that point decide it as a matter of law, but if that had been the case, the court would have granted a Rule 50A motion as made by the plaintiff at the close of the evidence when the court said, I'm denying the motion because there are disputed issues of fact about liability here. On the issue of the attorney's fees and addressing the issue of the multiplier, it's my understanding of Daig and other cases that you must make a necessary showing that the lodestar awarded was not a reasonable fee before there's an adjustment for a multiplier. No one has ever suggested in this case, other than Chris Bertolli, that the $638,000 in fees is not a reasonable amount. And the trial court in granting the fee request and the multiplier did not make such a finding. And that, I believe, is a predicate of any consideration of a multiplier. There's no showing here. And there's no claim here. We have to, at the very least, read this as an implicit finding. I don't believe there's an implicit finding, Your Honor. They asked for $11,000 in fees more than they recovered under the court's order. They never asked, and frankly, in all due respect, the desirability of the case is one of the factors that you take into account under Hensley. It's one of the 12 factors. So there's no showing here. There's no finding here. There's no comment here by the plaintiff that it was not a reasonable fee, but yet the multiplier is awarded. And there is no showing in the record that Mr. Oberfelder was not able to obtain other counsel. In Guam, we had a declaration. There's another Ninth Circuit case. It's FODL, I might be mispronouncing it, F-A-D-H-L, where there were 35 separate attempts to obtain counsel and decline. That's a different story. Mr. Oberfelder was available during the trial. He was available in post-trial proceedings. Had there been any circumstance in which he had tried to obtain counsel, it should have been in the record, and it is not in this record. And in all due respect, we do not believe that a multiplier is justified under the circumstances. And, frankly, it's our feeling as to the $638,000 underlying Lodestar Award, that what's happening here is through a well-staffed but overstaffed effort here of 18 billers on this case, nine lawyers, three paralegals, that what's happening here is Chris Bertolli is being asked to pay for the learning curve. And we've requested that $221,000 and some odd dollars be reduced from the Lodestar. Thank you. Roberts. Thank you very much. The case in sight will stand submitted. We are now adjourned.
judges: Kozinski, Graber, Berzon